UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Kari Dallosto,

    Plaintiff,

v.                                No. 16 CV 50294
                                        Magistrate Judge Iain D. Johnston

Nancy A. Berryhill, Acting
Commissioner of Social Security,[1]

    Defendant.

**MEMORANDUM OPINION AND ORDER**

This is a Social Security disability benefits appeal. Plaintiff Kari Dallosto filed her applications in early 2012, shortly after being hospitalized for 13 days because of a manic episode that apparently started at a party at her parent's house. She was then 25 years old. Everyone, including the administrative law judge ("ALJ"), agrees that she has bipolar disorder and personality disorder. She suffers from difficult personal relationships and has engaged in risk taking behaviors and drug use. For example, she told a nurse that she once "[j]umped out of [a] two story building and landed on her feet." R. 512. She became pregnant at age 16 and had a daughter. Still, after high school, she was able to work in a series of jobs as a hairdresser until the February 2012 hospitalization.

This hospitalization serves as an anchor point in the competing factual narratives. In the ALJ's view, the hospitalization was plaintiff's low point and was one-off event—perhaps caused by the illegal drugs taken at the party—and plaintiff thereafter made steady improvement through therapy and medication. She was even able to work again as a hairdresser, albeit part-time at a nursing home, and took care of her daughter and exercised and did other things showing

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

the ability to work full-time. The ALJ also acknowledged that plaintiff had a few relapses in the post-hospitalization period from 2012 to 2015, but the ALJ viewed these problems as being caused by plaintiff's voluntary choice to quit counseling and take illegal drugs. Essentially, the ALJ believed that plaintiff's problems were lifestyle choices. As the ALJ stated, "chaos is a choice" and "not a complete medical restriction." R. 21.

A different view was offered by plaintiff's long-term therapist, Alison Wintrode, who treated plaintiff for many years. She opined, both in a letter and later in testimony at the administrative hearing, that the hospitalization led to a worsening of plaintiff's condition (it went form "moderate to severe") such that she was no longer able to work full-time. In the letter, she stated that plaintiff had "frequent volatile relationships," that she had only a "small and unstable" support system, that she had periods when she stopped counseling and quit her medication, and that she would have "a great deal of difficulty concentrating, staying on task and completing the requirements of her job." R. 683. In addition, she stated that plaintiff's visits with psychiatrists were "short and hurried." These psychiatrists "quickly dismissed or ignored" her concerns.

The latter statements appear to be referring to plaintiff's treatment with two medication oversight psychiatrists she saw after the hospitalization. The first was Dr. Jafry who has offered no opinion in this case. Then in 2014, plaintiff saw Dr. Syed Irfan who completed a form stating that plaintiff would miss five days a month and would be "off task" 30% of the time. R. 685.

There is one other relevant medical opinion. At the hearing, clinical psychologist Allen W. Heinemann testified.[2] For the most part, he agreed with Ms. Wintrode's and Dr. Irfan's opinions. He testified that plaintiff could manage her bipolar symptoms "for a period of time, so weeks, a few months, but sustaining that on an ongoing basis is difficult for her." R. 64. He

---

[2] This was the second hearing held in December 2014. There was also an earlier hearing, but for unexplained reasons, no transcript is available. Neither side argues that this transcript would be relevant to the current appeal.

2

noted that she was "not in a highly supportive arrangement." R. 65. He believed that if she were under greater stress, she would "deteriorate to some extent[;] whether it would be so serious [as] to require hospitalization. It's difficult to speculate." *Id.* Although he found that her impairments were not "at listing level," he opined that she would miss work one day a week (roughly four times a month instead of the five suggested by Dr. Irfan) and would be off task 25% of the time (as opposed to 30% stated by Dr. Irfan). R. 66. He explained as follows: "We do have the GAF's which are indicative of a severe impairment, severe work-related performance problems and I do think that Ms. Wintrode's testimony and letter in 12-F are consistent with that opinion of Dr. Irfan." *Id.* He added that plaintiff would "need more rest breaks than most employees would require" and noted that she lost her last job "because of difficulties relating." R. 67-68.

To summarize, three medical opinions supported, or arguably supported, plaintiff's claim. The ALJ rejected all three, relying largely on his layperson analysis.[3] Plaintiff argues that the ALJ ignored the treating physician rule, cherrypicked facts to support his preordained thesis, and relied on questionable assumptions about psychiatric impairments. This Court agrees.

Plaintiff argues that the ALJ failed to follow the well-known treating physician rule. It is undisputed that ALJ did not discuss the first step under this rule or apply the checklist under the second step. The Government concedes this point, acknowledging that the ALJ did not "explicitly weigh" every checklist factor, but argues that the factors were impliedly considered in the overall analysis and that this "is enough in the Seventh Circuit." Dkt. #12 at 5. This Court has previously expressed its view that an explicit analysis is still required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015) (summarizing the treating physician

---

[3] In a brief paragraph, the ALJ stated that he gave "substantial weight" to the opinions of the State Agency doctors. R. 21. However, the ALJ did not discuss these opinions, nor explain how they supported the ALJ's reasoning. And, after reading these opinions, the Court can find little correlation between them and the ALJ's analysis.

3

rule). Notwithstanding this point, even if the Government's more holistic approach were acceptable, this Court would still find the ALJ's analysis insufficient.

An important point—perhaps the central one justifying a remand—is that, aside from a few relatively minor exceptions, all three medical opinions were *consistent with each other*. This is significant. The ALJ glossed over this fact and instead engaged in a piecemeal divide-and-conquer strategy, examining each opinion seriatim. But at the hearing, the ALJ asked Dr. Heinemann whether he agreed more with Ms. Wintrode or Dr. Irfan, the presupposition being that their opinions conflicted. R. 62. However, Dr. Heinemann rejected the suggested dichotomy and instead characterized the opinions as being consistent with each other. R. 66. Consistency is a key principle embodied in the treating physician rule. The fourth checklist factor specifically refers to the "the consistency of the opinion with the record as a whole." The third factor refers to the "supportability" of the opinion. In considering the ALJ's rationales below, it is important to remember that these opinions reinforced each other. Given this interlocking consistency, the ALJ was required to come forward with compelling reasons to reject *all* three opinions *in toto*. The ALJ's analysis does not meet this standard.

**Ms. Wintrode.** The ALJ gave the most attention to Ms. Wintrode, offering multiple rationales for rejecting her opinions. However, these rationales, though numerous, rely on highly questionable factual premises, vague logical connections, or dubious assumptions.[4]

The ALJ's first criticism of Ms. Wintrode's opinion was not set forth in the formal analysis, but was interspersed into the earlier narrative summary. In effect, this criticism set the

---

[4] Ms. Wintrode's title is listed as LCPC, which apparently stands for Licensed Clinical Professional Counselor. As plaintiff recognizes, she does not qualify as an "acceptable medical source" under the treating physician rule, but her opinions still must be considered. Dkt. #7 at 14; *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (an ALJ may not reject an opinion by a nurse practitioner simply because he or she is not an acceptable medical source) (citing 20 C.F.R. §404.1513). The ALJ did not explicitly rely on Ms. Wintrode's level of expertise as a reason for discrediting her, although the ALJ repeatedly injected the phrase LCPC into the decision. Her expertise is an issue that may be considered on remand, as it relates to the fifth checklist factor (degree of specialization).

stage for later criticisms. However, this one rests on a shaky factual foundation, specifically a single statement by plaintiff. In response to a question asking her to identify strengths, plaintiff stated that "she has [a] positive support system through family, friends" and "has contact with support daily." R. 565. The ALJ seized upon this statement to discredit Ms. Wintrode's. Here is the explanation:

> [Plaintiff] appears to have relapsed and briefly stopped Rosecrance treatment. Therapy and medication oversight resumed in February 2013 (9F/6). Although the GAF was only 45, the claimant listed among her strengths and adaptive skills, "I am good at my job, I am good at caring for people," which seemingly implies adaptive coping reserves that bear upon the ability to perform work. The claimant also reported positive support through family and friends, *with whom she allegedly had daily contact* (9F/8). This detail implies that she had a support network she could call upon when coping became a struggle.
>
> This positive support system represents a significant discrepancy as far as therapist Alison Wintrode, LCPC, who offered the unsubstantiated statement that the claimant had a small and unstable support system (12F/1). This discrepancy goes towards the likelihood that the claimant is not able to provide accurate and specific details such that others reasonably can rely upon her history. It also follows that Alison Wintrode, LCPC, lacked the longitudinal familiarity that she claimed, which goes towards the absence of weight the undersigned can assign her opinion.

R. 18-19 (emphasis in original). The ALJ's characterization of this as being a "significant" discrepancy, as well as the ALJ's added italics, show that the ALJ placed weight on this point. But the problem is that, aside from this one aspirational statement, the record consistently points to the opposite conclusion—namely, that plaintiff's family, in particular her mother, were part of the problem (at least according to plaintiff). The medical record contains many statements supporting this contrary interpretation.[5] Plaintiff testified that "she had limited support" and that

---

[5] *See* R. 388 (plaintiff "feels she is the family scapegoat"); R. 392 ("States Mother hit her sister today, is upset, and sister wants her at school to make conference call to Mother"); R. 425 ("Client reports 'I use to beat my mother up'"); R. 429 ("Kari reports [] dysfunctional family"); R. 444 ("Client is living at home with her parents and she states the home is so chaotic. 'I hate I have beat my mother up so many times.'"); R. 462 ("she reports conflict at home and appears to rely on her parents to help her complete her responsibilities and care of her daughter"); R. 466 ("[plaintiff] reports she feels that what she does [is] not good enough for family") ("she discussed negative living environment—always feeling judged—especially by her mother") ("she reports when she is out of current environment she would be more productive"); R. 350 ("This pt states that living at home with her family is stressful,

5

she could not trust people, specifically mentioning her "own sister." R. 38, 44. Because of these issues, plaintiff eventually moved out of her parent's house. Dr. Heinemann concurred that plaintiff did not have a strong support system. In short, the evidence supports Ms. Wintrode's opinion that plaintiff's support system was "unstable." Given these serious doubts about the ALJ's factual premise, this particular rationale collapses. *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

The ALJ offered several other rationales later in the decision. The first was that Ms. Wintrode only saw plaintiff "intermittently since 2006," that her visits were "irregular," and that she, therefore, was "not in a position to offer an informed longitudinal perspective." R. 21. This argument implicates the first two checklist factors—length and nature of treatment relationship. The ALJ concluded that they undermined Ms. Wintrode's opinions. But it is perplexing why the ALJ believed this to be true. The duration and frequency of Ms. Wintrode's treatment relationship dwarf that of all the other medical providers. She treated plaintiff for eight years, seeing her years before and after the pivotal 2012 hospitalization. She was, therefore, the only medical provider who had a before-and-after perspective. According to her treatment notes, she saw plaintiff, by this Court's count, approximately 75 times and also, according to her testimony, participated in additional phone consultations. Her therapy sessions were presumably much longer than the 15-minute-or-less medical oversight visits with Dr. Jafry. The ALJ failed to acknowledge these details. It is true, as Ms. Wintrode herself noted, that there were "times when [plaintiff] stopped coming to counseling" during this eight-year span, but these gaps do not mean that she lacked a longitudinal perspective, especially compared to the agency physicians who *never* saw plaintiff. Dr. Heinemann, the medical expert, praised Ms. Wintrode's perseverance,

---

but she does not have anywhere else to go."); R. 218 ("I saw some abuse happen @ home & I felt like it was my fault."); R. 730 ("The patient reported she has been having problems with her mother also."); R. 567 ("I live in this loud house – my mom yells—and I am constantly blamed for stuff.").

6

stating: "I think, to her credit, Ms. Wintrode has established a therapeutic relationship, is compassionate with the claimant and the difficulty she has at times, maintaining a consistent therapy relationship." R. 63.

The ALJ's next criticism is that Ms. Wintrode's treatment notes "contain little information." R. 21. This rationale is erroneous. The notes consist of 24 handwritten pages with a short paragraph for each visit. The ALJ provided the following explanation:

> For example, on June 3, 2014, she records that the claimant has trouble going out. An old friend feels that Facebook causes trouble. She closed the account. She is not doing billing for the job (15F/5). On July 22, 2014, the claimant still was having issues with her sister. There were issues concerning money spent, the claimant feeling put upon, and the claimant spending time with friends younger than her (15F/7). On October 27, 2014, the claimant returned after missing a month. She still was struggling with work. She stood for 1/2 the session (15F/10).

R. 21. Put aside whether these three examples from the 75 or so entries are truly representative, the Court is not clear why they undermine Ms. Wintrode's opinion. Several statements are directly relevant. Consider plaintiff's part-time work as a hairdresser. The ALJ mentioned this fact as a reason why plaintiff could work. But Ms. Wintrode's observation that plaintiff was "still . . . struggling with work" and "not doing billing for the job" support a contrary inference. Other statements (*e.g.* "still was having issues with her sister") show continuing problems with social interaction. Other statements are less obviously relevant (*e.g.* why was she standing for half of the therapy session?) but they do not contradict Ms. Wintrode's opinions.

The ALJ also faulted Ms. Wintrode for supposedly engaging in speculation. The ALJ explained as follows:

> Most of [Ms. Wintrode's] conclusions appear to involve unsupported speculation, e.g., "Throughout her treatment, Kari has had times when she stopped coming to counseling or went off of her medication. This is a frequent issue for persons of this disorder." The latter may be true, but it is not necessarily a reason to infer that she lacks adaptive reserves or is unable to perform some work, particularly when she is working part-time.

7

R. 21. The ALJ's broader assertion—that "most" of Ms. Wintrode's conclusions are speculative—is again based on only an isolated example. As a factual matter, Ms. Wintrode did not speculate that plaintiff stopped counseling periodically; she observed this fact. As for whether this was a frequent issue for bipolar patients in general, the ALJ obliquely cast doubt on the claim by stating that it "may" be true, but the ALJ offered no evidence to suggest that this "speculation" was unwarranted. There was no dispute that plaintiff was bipolar. And the reason why plaintiff stopped counseling was important. The ALJ repeatedly suggested that plaintiff did so based on lifestyle preferences. In sum, the Court does not find Ms. Wintrode's "speculation" either false or improper.

The ALJ next suggests that Ms. Wintrode's opinion rested solely on the "lone February 2012 hospitalization [from] *three years before.*" R. 21 (emphasis supplied by the ALJ). But Ms. Wintrode did not rely on this one incident. Her opinion was based on "working as a therapist with [plaintiff] for eight years." R. 683. The ALJ believed that the 2012 hospitalization was a "discrete" event, and asserted that the "record contains no other reports of 'mania' or psychosis." R. 22. This raises a question whether the ALJ wrongly assumed that a manic episode only occurs when a person is hospitalized. But this assumption is misguided. *See Voigt*, 781 F.3d at 876 (the lack of hospitalization does not mean that a claimant does not have serious mental health problems). Logically, if the lone hospitalization were the only evidence of mania, then it would raise a question as to why plaintiff's doctors, as well as the ALJ, concluded that she had bipolar disorder in the first place. In sum, although the ALJ articulated various rationales for giving Ms. Wintrode's opinion no weight, these rationales are flawed in various ways.

**Dr. Irfan.** The ALJ offered fewer reasons directed at Dr. Irfan's opinion. The main rationale appears to be that, although Dr. Irfan's bottom-line conclusions—that plaintiff would

8

be "off task" 30% of the time and would miss five days a month—would lead to a finding that plaintiff was disabled, Dr. Irfan made intermediate findings supposedly undermining these conclusions. Specifically, Dr. Irfan never checked the most disabling category entitled "not able to perform," although he did check several times the box entitled "seriously limited, but not precluded." R. 22. The ALJ believed that these findings cast doubt on the conclusions. But this Court does not find that this is necessarily contradictory because Dr. Irfan could have concluded that *cumulative effect* of the individual limitations justified the bottom-line conclusions.

The other rationale is that Dr. Irfan "was prepared to dismiss plaintiff from his practice" because of concerns about her medication compliance and cooperativeness. R. 22. The ALJ believed that these statements undermined Dr. Irfan's opinion. Plaintiff, on the other hand, argues the opposite, claiming that Dr. Irfan's willingness to offer an opinion *despite* these concerns enhances his credibility. This Court is more persuaded by plaintiff's reasoning, but in any event, the ALJ's argument, even if accepted, is a woefully thin rationale for rejecting his opinion.

**Dr. Heinemann.** The ALJ offered two main reasons for rejecting Dr. Heinemann's testimony.[6] The ALJ believed that Dr. Heinemann "relied almost exclusively" on Ms. Wintrode's testimony and had "little folder familiarity." The suggestion is that the doctor rubber-stamped Ms. Wintrode's opinion and had little independent knowledge of the record. But neither criticism is borne out by a reading of the transcript. Dr. Heinemann discussed specific exhibits (*e.g.* 1F, 2F, 3F, and 14F) and referred to specific pages in some of them. There is nothing to suggest he lacked familiarity with the record. During this discussion, he made no reference to

---

[6] There appears to be a glitch, or possible omission, in the ALJ's decision at page 11 (R. 22). The ALJ discussed Dr. Irfan's testimony and then, seemingly in the middle of that discussion, began discussing reasons that clearly related to Dr. Heinemann's testimony. Perhaps a transition paragraph was left out? The parties do not mention this discrepancy.

9

Ms. Wintrode's testimony. It was only toward the end of his testimony, and then at the urging of the ALJ, that he commented on Ms. Wintrode's testimony. As noted above, he did agree with much of her testimony. But this is not evidence that he failed to exercise independent judgment, just as an appellate court's affirmance of a lower court decision would not mean that it failed to carefully review the issues. Moreover, because he was the impartial expert, playing the role of a clean-up hitter, part of his job was to help the ALJ reconcile the earlier opinions. It thus would be natural for him to comment on Ms. Wintrode's testimony, which he did, and on Dr. Irfan's opinion, which he also did.

In sum, the Court finds that the ALJ's reasons for rejecting these three, largely consistent opinions were insufficient and that a remand is, therefore, required. Given this conclusion, the Court will only briefly comment on a few remaining concerns. As noted above, the ALJ repeatedly criticized plaintiff for not staying in therapy and for taking street drugs such as marijuana. The ALJ apparently believed that plaintiff would have had no major problems if she simply exercised more self-control.[7] But the ALJ never considered possibility that plaintiff's impairments made such control difficult. The Seventh Circuit has repeatedly told ALJs to consider this alternative possibility.[8] Here, there is no evidence that the ALJ did so.

---

[7] The ALJ mentioned this point often. *See* R. 18 ("She again was not taking her medication, so her emotional state was 'up and down,' which begs the question of whether she could have had optimum control if she took her medications as prescribed."); R. 19 ("The record is replete with instances of the claimant starting and stopping Rosecrance Mental Health Center services to suit her preferences [], which supports an inference of choice, volition, insight and capacity."); R. 20 ("Medication misuse seemed to play a role in her presentation.").

[8] *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."); *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("[M]ental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.") (citations omitted).

More broadly, there are a number of areas where the ALJ cherrypicked evidence or ignored contrary lines of evidence. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion). The Court will note two examples. One is plaintiff's part-time work. The ALJ referred to this several times, arguing that it showed that plaintiff had, in the ALJ's oft-repeated expression, "adaptive reserves." But the ALJ did not acknowledge contrary evidence showing that plaintiff had trouble with billing, got into conflicts with co-workers, only worked sporadically three days a week at the nursing home job, and had to quit several of these jobs. Plaintiff testified that she "would miss her scheduled day to do the hairdressing at least once a week." R. 34. There is no evidence that the ALJ considered these qualifications when giving weight to this argument.

Another issue was that, according to the ALJ, plaintiff was taking care of her daughter. *See, e.g.*, R. 15. However, at the hearing, plaintiff stated that her daughter was living with plaintiff's parents. Plaintiff stated that whenever her daughter came over to her house for a visit she would "get really irritated and [would] freak out" because she could not handle the stress. R. 65. The fact that plaintiff no longer had physical custody was a significant fact to omit when discussing this issue. This omission is another example of cherrypicking.

As a final note, this Court's opinion should be personally delivered to and read by whichever ALJ hears the case on remand so that the same errors to not occur, a phenomena all too often in Social Security cases. *See Wallace v. Colvin*, 193 F. Supp. 3d 939, 942 (N.D. Ill. 2016) (collecting cases).

\* \* \*

For all the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: October 10, 2017          By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge